IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

MARY J. KANDEL,

    Plaintiff,

    v.            Civil Action No. 2:04-CV-71

JO ANNE B. BARNHART,
COMMISSIONER OF
SOCIAL SECURITY,
      Defendant.

## REPORT AND RECOMMENDATION
## SOCIAL SECURITY

### I. Introduction

A. <u>Background</u>

  Plaintiff, Mary J. Kandel, (Claimant), filed her Complaint on September 29, 2004, seeking

Judicial review pursuant to 42 U.S.C. § 405(g) of an adverse decision by Defendant, Commissioner

of Social Security, (Commissioner).[1] Commissioner filed her Answer on January 6, 2005.[2] Claimant

filed her Motion for Summary Judgment on April 5, 2005.[3] Commissioner filed her Motion for

Summary Judgment on May 2, 2005.[4]

B. <u>The Pleadings</u>

    1. <u>Claimant's Motion for Summary Judgment</u>.[5]

---

[1] Docket No. 1.

[2] Docket No. 8.

[3] Docket No. 11.

[4] Docket No. 13.

[5] Docket No. 11.

2. <u>Commissioner's Motion for Summary Judgment</u>.[6]

C. <u>Recommendation</u>

1. I recommend that Claimant's Motion for Summary Judgment be DENIED, and this matter be REMANDED to the Commissioner of Social Security to consider explicitly and state the reasons for determining whether Claimant satisfies the pertinent listings of Appendix 1.

2. I recommend that Commissioner's Motion for Summary Judgment be DENIED for the same reasons set forth above.

## II. Facts

A. <u>Procedural History</u>

Claimant previously filed an application for Supplemental Security Income payments on April 7, 1998. The claim was denied initially on October 28, 1998. Claimant did not take any further action with regard to the application. On October 15, 2001, Claimant filed for Social Security Income (SSI) payments alleging disability since June 30, 2001. The application was denied initially and on reconsideration. A hearing was held on July 24, 2003 before an ALJ. The ALJ's decision, dated August 14, 2003, denied the claim finding Claimant not disabled within the meaning of the Act. The Appeals Council denied Claimant's request for review of the ALJ's decision on July 16, 2004. This action was filed and proceeded as set forth above.

B. <u>Personal History</u>

Claimant was 45 years old on the date of the July 24, 2003 hearing before the ALJ. Claimant has a high school equivalency degree and one year of college education. Her past work experience

---

[6] Docket No. 13.

includes employment store cashier.

C.     Medical History

The following medical history is relevant to the time period during which the ALJ

concluded that Claimant was not under a disability: June 30, 2001–August 14, 2003.

**United Medical Hospital, DB Chest 2 views PA & LAT, 09/17/1997, Tr. 125**
IMPRESSION: Normal Chest

**Richard E. Topping, M.D., 05/01/2001, Tr. 139-143**
IMPRESSION: 1. Left side trochanteric bursitis
             2. Osteoarthritis of the left hip

**Webster County Memorial Hospital, Physicians Emergency Record, 10/31/2001, Tr. 144-148**
DIAGNOSTIC IMPRESSION: contusion left shoulder, strain left shoulder, contusion head, left
knee contusion

**Webster County Memorial Hospital, Triage Assessment, 10/09/2001, Tr. 149-151**
DIAGNOSIS: hypoglycemia

**Webster County Memorial Hospital, Triage, 02/01/2001, Tr. 152-153**
DIAGNOSIS: Bronchitis

**West Virginia Department of Human Services, Physician Summary, 11/07/2001, Tr. 154**
DIAGNOSIS: osteoarthritis hips, back, COPD
EMPLOYMENT LIMITATIONS: no lifting of more than ten pounds frequently, limit standing,
sitting, walking, avoid environmental toxins, chemicals

**West Virginia Disability Determination Service, Transcript of telerecorded message,
04/24/2002, Tr. 155-164**
DIAGNOSIS: osteoarthritis, bronchial asthma, and chronic obstructive lung disease

**Functional Capacity Assessment, 05/08/2002, Tr. 165-172**
PRIMARY DIAGNOSIS: Asthma
SECONDARY DIAGNOSIS: arthritis
EXERTIONAL LIMITATIONS: occasionally lift and or carry 50 pounds, frequently lift and or
carry 25 pounds, stand or walk (with normal breaks) about 6 hours in an 8-hour workday, sit
(with normal breaks) about 6 hours in an 8-hour workday
ENVIRONMENTAL LIMITATIONS: avoid concentrated exposure to fumes, odors, dusts,
gasses, poor ventilation, etc.

**Webster County Memorial Hospital, Clinic Record, 08-27-2002, Tr. 173**

DIAGNOSIS: Chronic hip pain, COPD

**Webster County Memorial Hospital, Triage Assessment, 08/05/2002, Tr. 174**
DIAGNOSIS: bronchitis, left serous om, depression

**Webster County Memorial Hospital, Clinic Record, 07/30/2002, Tr. 175**
DIAGNOSIS: depression, arthralgias, osteoarthritis

**Webster County Memorial Hospital, Clinic Record, 06/11/2002, Tr. 176**
DIAGNOSIS: Left hip pain, OA, COPD

**Webster County Memorial Hospital, Triage Assessment, 03/27/2002, Tr. 178**
DIAGNOSIS: bronchitis

**Webster County Memorial Hospital, Clinic Record, 12/14/2001, Tr. 181**
DIAGNOSIS: OA left hip- severe pain, COPD

**Webster County Memorial Hospital, Clinic Record, 11/07/2001, Tr. 182**
DIAGNOSIS: multiple contusions healing(?), headache

**Webster County Memorial Hospital, Clinic Record, 09/26/2001, Tr. 183**
DIAGNOSIS: COPD, resolving pneumonia,

**Webster County Memorial Hospital, Clinic Record, 09/24/2002, Tr. 184**
DIAGNOSIS: hypoglycemia

**Webster County Memorial Hospital, Clinic Record, 08/07/2001, Tr. 188**
DIAGNOSIS: OA hips, asthma, anxiety

**Webster County Memorial Hospital, Clinic Record, 06/27/2001, Tr. 189**
DIAGNOSIS: arthritis, asthma

**Webster County Memorial Hospital, Clinic Record, 05/24/2001, Tr. 190**
DIAGNOSIS: OA left hip

**Webster County Memorial Hospital, Clinic Record, 04/25/2001, Tr. 191**
DIAGNOSIS: arthralgias

**Webster County Memorial Hospital, Clinic Record, 03/14/2002, Tr. 192**
DIAGNOSIS: exacerbatic(?) left hip OA

**Webster County Memorial Hospital, Clinic Record, 03/08/2001, Tr. 193**
DIAGNOSIS: COPD

**Webster County Memorial Hospital, Clinic Record, 02/08/2001, Tr. 194**
DIAGNOSIS: COPD

**Webster County Memorial Hospital, Clinic Record, 01/06/2001, Tr. 195**
DIAGNOSIS: COPD

**Webster County Memorial Hospital, Clinic Record, 11/21/2000, Tr. 198**
DIAGNOSIS: URI Resolving

**Webster County Memorial Hospital, Clinic Record, 11/14/2000, Tr. 199**
DIAGNOSIS: URI

**Webster County Memorial Hospital, Clinic Record, 10/04/2000, Tr. 200**
DIAGNOSIS: COPD

**Webster County Memorial Hospital, Clinic Record, 09/14/2000,Tr.  201**
DIAGNOSIS: arthritis exacerbate

**Webster County Memorial Hospital, Clinic Record, 08/01/2000, Tr. 202**
DIAGNOSIS: COPD, allergic rhinitis

**Webster County Memorial Hospital, Clinic Record, 06/28/2000, Tr. 203**
DIAGNOSIS: COPD

**Webster County Memorial Hospital, Clinic Record, 05/05/2000, Tr. 205**
DIAGNOSIS: COPD, pleurisy

**Webster County Memorial Hospital, Clinic Record, 05/03/2000, Tr. 206**
DIAGNOSIS: eye dryness

**Webster County Memorial Hospital, Clinic Record, 04/27/2000, Tr. 207**
DIAGNOSIS: bronchitis, COPD

**Webster County Memorial Hospital, Clinic Record, 03/22/2000, Tr. 208**
DIAGNOSIS: COPD, bronchitis, OA

**Webster County Memorial Hospital, Clinic Record, 03/21/2000, Tr. 209**
DIAGNOSIS: OA

**Webster County Memorial Hospital, Clinic Record, 02/23/2000, Tr. 210**
DIAGNOSIS: COPD

**Webster County Memorial Hospital, Clinic Record, 01/17/2000, Tr. 211**
DIAGNOSIS: COPD, bronchitis

**Laboratory Corporation of America, 07/30/2002, Tr. 219**
RESULTS: Rheumatoid Arthritis Factor
                    RA Latex Turbid        Normal
              Antinuclear Antibodies (ANA) Negative


**Webster County Memorial Hospital, Lab results, 07/30/2002, Tr. 220**
RESULTS: WBC is low (4.6) should be 4.8-10.8 K/uL, MCH is high (31.8) should be 27-31 pg


**Webster County Memorial Hospital, Lab results, 09/21/2001, Tr. 22**
RESULTS: WBC is high (11.6) should be 4.9-10.8 K/uL, MCH is high (31.8) should be 27-31 pg, GRA% is high (82.3) should be 42.2-75.2%, LYM% is low (12.3) should be 20.5-51.1%, GRAN# is high (9.6) should be 1.4-6.5 K/uL


**Webster County Memorial Hospital, Lab results, 09/19/2001, Tr. 223**
RESULTS: RBC is low (4.7) should be 4.2-6.1 m.uL, MCH is high (32) should be 27-31 pg, GRA% is high (81.2) should be 42.2-74.2%, LYM% is low (13.3) should be 20.5-51.1%, GRAN# is high (7) should be 1.4-6.5 K/uL, LYMP# is low (1.1) should be 1.2-3.4 K/uL, BUN is low (5) should be 7-18 mg/dL, Ca is low (8.2) should be 8.5-10.5 mg/dL, Glu is low (65) should be 70-105 mg/dL


**Webster County Memorial Hospital, Lab results, 08/07/2001, Tr. 225-226**
RESULTS: Chol high (254) should be 0-200 mg/dL, Trig is high (254) should be 0-200 mg/dL, LDL is high (151) should be 30-130 mg/dL, VLDL is high (51) should be 5-40 mg/dL, CRF is low (2.91) should be 3-7 mg/dL, WBC is high (11) should be 4.8-10.8 K/uL, MCH is high (32.2) should be 27-31 pg, LYM% is low (19.5) should be 20.5-51.1%, GRAN# is high (8.1) should be 1.4-6.5 K/uL, MID# is high (.8) should be .1-.6 K/uL, BUN is low (6) should be 7-18 mg/dL


**Webster County Memorial Hospital, 10/31/2001, Tr. 231-232**
IMPRESSION: left shoulder, left forearm, skull, right knee, and right lower leg all show no acute fracture or dislocation


**Webster County Memorial Hospital, 07/07/2001, Tr. 233**
IMPRESSION: Mild degenerative changes of both hips.  Likely phleboliths right side pelvis.  No other acute abnormality seen.


**Webster County Memorial Hospital, Bilateral mommography, 09/29/1999, Tr. 234**
IMPRESSION: No evidence of malignancy and no change.


**Webster County Memorial Hospital, X-Ray Report, 10/27/1998, Tr. 235**
IMPRESSION: Normal chest


**Sharon Joseph, Ph.D., Mental Status Exam, 08/30/2002, Tr. 237-240**
DIAGNOSTIC IMPRESSION:
Axis I-Adjustment Disorder with Depressed Mood, Chronic Pain Disorder with both physical and

psychological components
Axis II- Deferred
Axis III- Asthma, osteoarthritis, chronic pain, and hypoglycemia, per claimant's report

**Psychiatric Review Technique, 10/09/2002, Tr. 240-253**
DISORDER: Adjustment Disorder, Pain Disorder
LIMITATIONS: Restriction of Activities of living daily-mild
                          Difficulties in Maintaining Social Functioning-mild
                          Difficulties in Maintaining Concentration, Persistence, or Pace- mild

**Physical Residual Functional Capacity Assessment, 10/11/2002, Tr. 254-262**
EXERTIONAL LIMITATIONS: occasionally lift and or carry 50 pounds, frequently lift and or carry 25 pounds, stand or walk (with normal breaks) about 6 hours in an 8-hour workday, sit (with normal breaks) about 6 hours in an 8-hour workday
ENVIRONMENTAL LIMITATIONS: avoid concentrated exposure to extreme cold, avoid concentrated exposure to fumes, odors, dusts, gasses, poor ventilation, etc.

**Rheumatology &Pulmonary Clinic, PLLC, X-Ray of Bilateral Hands, 12/11/2002, Tr. 263**
IMPRESSION: Inflammatory arthritis with soft tissue swelling around the PIPs. Consider early rheumatoid arthritis. Clinical correlation recommended.

**Rheumatology &Pulmonary Clinic, PLLC, 11/20/2002, Tr. 264-265**
IMPRESSION: Fibromyalgia, active and severe, possible inflammatory arthritis

**Rheumatology &Pulmonary Clinic, PLLC, 12/11/2002, Tr. 266**
IMPRESSION: Fibromyalgia, early inflammatory arthritis

**Webster County Memorial Hospital, Clinic Record, 02/03/2003, Tr. 267**
DIAGNOSIS: Arthritis in hips, depression, asthma, COPD, Fibromyalgia

**Webster County Memorial Hospital, Clinic Record, 01/03/2003, Tr. 270**
DIAGNOSIS: Fibromyalgia, COPD, Depression

**Webster County Memorial Hospital, Triage Assessment, 12/18/02, Tr. 271**
DIAGNOSIS: Lower back pain

**Webster County Memorial Hospital, Clinic Record, 12/02/2002, Tr. 272**
DIAGNOSIS: OA hips, COPD

**Webster County Memorial Hospital, Clinic Record, 10/02/2002, Tr. 273**
DIAGNOSIS: OA hips, Possible RA, COPD

**Webster County Memorial Hospital, Radiology Requisition, Bilateral Hips, 09/17/2002, Tr. 274**

IMPRESSION: The joint space narrowing, subchondral sclerosis, geode formation, and central migration of both femoral heads may represent rheumatoid arthritis.

**Lake County Memorial Hospitals, 03/22/1975, Tr. 275-283**
CLINICAL IMPRESSION: Fracture of D-11 and D-12 vertebral bodies.

**Trumbull Memorial Hospital, Emergency Record, 06/15/1992, Tr. 284**
DIAGNOSIS: acute exacerbatic back pain

**Trumbull Memorial Hospital, Emergency Record, 10/20/1989, Tr. 286**
DIAGNOSIS: acute strain right shoulder, acute contusion right knee

**Trumbull Memorial Hospital, Emergency Record, Tr. 287**
DIAGNOSIS: contusion left foot

**Trumbull Memorial Hospital, 05/25/1988, Tr. 288**
DIAGNOSIS: acute Pyelonephritis

**Trumbull Memorial Hospital, Radiology Imaging/Consultation Report, 08/05/1992, Tr. 291**
IMPRESSION: Spine Dorsal Routine w/ct junct- no acute fracture, Spine Lumbosacral- no significant abnormalities noted.

**Trumbull Memorial Hospital, Radiology Imaging/Consultation Report, 01/14/1992, Tr. 292**
IMPRESSION: Thickened folds of the duodenal bulb compatible with duodenitis. Cannot rule out additional small active ulcer. Clinical correlation suggested.

**Trumbull Memorial Hospital, Barium Enema, 01/12/91, Tr. 293**
IMPRESSION: Barium enema showing no gross evidence of pathology. Retention of fecal material.

**Trumbull Memorial Hospital, Spine Lumbosacral, 08/11/90, Tr. 294**
IMPRESSION: Lumbosacral Spine within normal limits. (?) Slight subluxation of the coccygeal articulation as described.

**Trumbull Memorial Hospital, Radiology Consultant Report, 10/20/89, Tr. 296**
IMPRESSION: Normal right shoulder, normal right knee

**Trumbull Memorial Hospital, Radiology Consultant Report, 09/05/89, Tr. 298-300**
IMPRESSION: normal left knee, normal right knee, normal left hand, normal right hand, slight arthritic changes in the lower dorsal spine, normal left foot.

**Trumbull Memorial Hospital, IV Pyelogram, 04/16/88, Tr. 302**
IMPRESSION: normal intravenous pyelogram

**Trumbull Memorial Hospital, Gallbladder sonogram, 04/18/88, Tr. 303**
IMPRESSION: normal gallbladder sonogram

**Trumbull Memorial Hospital, Spine Cervical Routine and Lateral, 02/04/88, Tr. 304**
IMPRESSION: slight arthritic changes

**ARH Medical Assoc. /SWVC, 03/12/03, Tr. 307**
RESULTS: HGB is high (14.3) should be 12-14 G/DL, MCH is high (32) should be 27-31 PG, %MIDS in high (10.9) should be 0-8%

**Cardinal Psychological Services, L.L.C., Psychological Evaluation, 05/15/03, Tr. 309-315**
DIAGNOSTIC IMPRESSION:
Axis I: 311. Depressive Disorder, Not Otherwise Specified
Axis II: 799.9 Deferred
Axis III: "Bone Deterioration, Asthma, Fibromyalgia" by client report
Axis IV: Occupational Problems and Problems related to the social environment
Axis: V: 65

**Psychiatric Review Technique, 06/11/03, Tr. 316-334**
AFFECTIVE DISORDERS: Depressive syndrome characterized by anhedonia or pervasive loss of interest in almost all activities, sleep disturbance, decreased energy, feelings of guilt of worthlessness, and difficulty concentrating or thinking.
LIMITATIONS:
Restriction of Activities of living daily- moderate
Difficulties in Maintaining Social Functioning- marked
Difficulties in Maintaining Concentration, Persistence, or Pace-moderate
Repeated Episodes of Decompensation, Each of extended Duration- one or two
Understand and remember short, simple instructions- significant
Carry out short, simple instructions-significant
Understand and remember detailed instructions- moderate
Carry out detailed instructions- moderate
Exercise judgment or make simple work-related decisions- marked
Sustaining attention and concentration for extended periods- significant
Maintaining regular attendance and punctuality- moderate
Completing a normal workday and workweek without interruptions from psychological symptoms and performing at a consistent pace without an unreasonable number and length or work breaks- moderate
Interacting appropriately with the public- moderate
Responding appropriately to direction and criticism from supervisors- moderate
Working in co-ordination with others without being unduly distracted by them- moderate
Working in co-ordination with others without unduly distracting them- moderate
Maintaining acceptable standards of grooming and hygiene- significant
Maintaining acceptable standards of courtesy and behavior- significant
Relating predictably in social situations in the workplace without exhibiting behavioral extremes-

moderate

Demonstrating reliability- moderate

Ability to ask simple questions or request assistance from coworkers and supervisors- significant

Ability to respond to changes in the work setting or work process- marked

Ability to be aware of normal hazards and take appropriate precautions- significant

Carrying out an ordinary work routine without special supervision-marked

Setting realistic goals and making plans independently of others- significant

Traveling independently in unfamiliar places- moderate

Ability to tolerate ordinary work stress- marked

**Fibromyalgia Residual Functional Questionaire, 07/03/03, Tr. 335-344**

DIAGNOSIS IMPAIRMENTS: chronic pain syndrome, Osteoarthritis of hips

PROGNOSIS: fair-poor

SYMPTOMS: multiple tender points, nonrestorative sleep, chronic fatigue, morning stiffness, subjective swelling, depression, multiple trigger points, anxiety, myofacial pain syndrome

LIMITATIONS: moderately limited (was not checked in this Dr.'s office), can sit, stand, walk less than 2 hours at a time, can frequently lift <10-10 pounds, occasionally lift 20 pounds, and never lift 50 pounds, sometimes has difficulty reaching, handling, or fingering, can frequently bend and twist at the waist, has severe depression

**Webster County Memorial Hospital, Clinic Record, 04/01/03, Tr. 355**

DIAGNOSIS: OA hips, Fibromyalgia, COPD

**Webster County Memorial Hospital, Mammography, 04/09/03, Tr. 356**

IMPRESSION: No mammographic evidence of malignancy.

**Webster County Memorial Hospital, Clinic Record, 06/03/03, Tr. 360**

DIAGNOSIS: Depression, OA hips, FM, COPD

D.    Testimonial Evidence

1. Claimant

Testimony was taken at the hearing from Claimant, who testified as follows (Tr. 369-404):

Q    How many miles do you drive in a typical week, say?  Just an estimate.

A    I really don't.

Q    Okay.  How come?

A    It's too painful to try to get in and out of a vehicle.

Q    Due to your arthritis?

A       Yes, sir.

ALJ     Okay.  Okay, Ms. Van Nostrand.

                    *               *               *

Q       Okay.  So one of those medications then is a pill.  Now, approximately, how often
do you suffer from asthma?

A       Quite a bit during the day.  I use my emergency breather on a regular basis.

                    *               *               *

A       I've had trouble breathing all my life.  I was diagnosed with chronic bronchitis
years ago.

Q       Has your condition changed over time?

A       It's gotten worse.

                    *               *               *

A       Oh, cologne, pollen, any kind of cleaning supplies.

Q       Okay.  Now, are those - - if you are around a smell of cologne or cleaning supplies
if you are not stressed, if you're not emotionally upset, would you nevertheless have breathing
problems?

A       Yes, ma'am.

Q       Okay.  So, apparently, not all of your breathing is stress-related then?

A       Right.

                    *               *               *

A       It's mainly during the morning and the evenings is when the breathing gets real
rough.

                *           *          *

A      For at least an hour or two in the morning.

                *           *          *

A      Sometimes it won't clear up.  If it's like in the springtime - -

Q      Um-hum.

A      - - and there's more pollen than normal - -

Q      Um-hum.

A      - - it'll trigger it for all day long.  But sometimes after my lungs have cleared a little bit, maybe use - - have to use my breather maybe only once or twice in the afternoon.

                *           *          *

A      I have to sleep with at least four pillows to prop myself up in order to be able to breathe properly.

Q      Approximately how much sleep do you get in an average night?

A      Between the pain and my breathing, about three hours a night.

Q      Now, is that broken sleep, on and off, or - -

A      Um-hum.

Q      - - straight through?

A      It's on and off.

                *           *          *

A      There's a lot of times that there's - - sometimes when it's hard to breathe just walking through one room to get to another room.  And sometimes I'll take and go in the bathroom and put a towel over my head and let the steam try and clear my lungs up a little bit.

12

*          *          *

Q      Sink.  All right.  Now, you mentioned pain.  So I'd like for you to tell me where you feel pain.

A      From the top of my head to the bottom of my toes.

Q      Are there any areas of your pain that are worse than others?

A      Yes, my hip area is worse - -

Q      Now, is that one - -

A      - - and my back area.

Q      Is that one hip or both hips?

A      The - - it's mainly the left hip, but I'm starting to get the pains in the right hip.

*          *          *

Q      What can you do and what can't you do in terms of physical exertion?

A      I can't do a whole lot.

Q      Well, let me - -

A      It's pretty much difficult to do just about anything.

*          *          *

Q      All right.  Well, let me ask you some questions just generally, then.  Are you comfortable in a seated position and that's as you are now in a regular chair with your feet on the floor in a - -

A      No.

Q      You're not?

A      No, I'm not.

Q        Okay.  What about standing?  Are you comfortable in a standing position?

A        No.

                     *                *             *

Q        What about climbing steps?

A        Very difficult and I have to have assistance doing so.

Q        What about one or two steps?

A        It's difficult, but if I have to I can - - if there's something that I can grab a hold of to help pull me up, I can do it.  But - -

Q        Okay.  Now, do you have any difficulty lifting or carrying objects?

A        Yes, ma'am.

Q        Could you tell me what you are able to lift and carry and what would give you difficulty?

A        Just bending over to pick something up is very difficult.

Q        And what about waist-level?  Let's say that you were able to, say, get something out of the refrigerator and carry it across the kitchen - -

A        Yes.

Q        - - and put it on the counter.  Approximately how much weight or volume do you think you could lift and carry on a regular basis?

A        I would say only a couple of pounds.

                     *                *             *

A        I have very little energy.

Q       How long has that been true?

A       It's - - that's been going on for awhile.  Probably about a year.

*                *                *

A       My daughter pretty much helps me get all that done because I can't really bend over to pick clothes up.

*                *                *

Q       On a scale from zero to ten - - now, zero is no pain and ten is the worst pain, emergency room-type pain.  Could you use that little scale from zero to ten and tell us something about your pain during an ordinary day?

A       An ordinary day pretty much would be about a seven or an eight.  On my worst days, the scale would have to go higher.

Q       Now, I see that you're rubbing your - - the top of your right thigh.  What's happening there?

A       It just - - it helps calm me down a little bit and my muscles are - - get spasms in them.

Q       How often do you have muscle spasms and where?

A       Daily in my legs, my feet, and my back.

Q       Okay.  Now, you commented about your hands.  Could you tell me a little bit about your hands?

A       They're starting to get the deformity of twisting and they all used to be straight and now they're not.  My index fingers are twisting in and he - - the doctor said something about the inflammation in my fingers as far as rheumatoid arthritis.

Q       Well, how - - are you impacted in any way by the changes in your hands?

A       Oh, yeah.

Q       Could you tell me a little bit about that?

A       It's hard for me to grasp a hold of something.  A coffee cup will slip straight out of my hand.

Q       Okay.  What about doing things like buttoning buttons or zippers or writing or - -

A       Writing is very difficult.  I can't do small buttons at all.

Q       Okay.  Have you changed your clothing in any way?

A       Yes, I have.

Q       Tell me about that.

A       Pretty much T-shirts or something like a pullover that my daughter can help me with.

Q       Does she help you dress?

A       Yes, she does.

Q       How often does she have to help you dress?

A       Daily.

Q       What aspects of dressing have - - are the most difficult?

A       The most difficult is to put my pants on and put on my shoes and socks.

Q       What is it about doing that seems to be the problem?

A       It's entirely too painful to bend over to try and put anything on.  And sometimes I can't even reach my feet from the pain.

                        *               *               *

Q        Approximately how often do you have a panic attack?

A        Just being around a bunch of people can set off a panic attack. I probably have them on the average probably about three of them a week.

Q        Do you ever have them at home alone?

A        Yes.

Q        Well, let's talk about the difference.  What is it about being around people and how many people are you talking about?

A        10, 12 people.  Loud noise.

                        *                *                *

A        Just afraid of being by myself.

Q        Do you know what there is about being by yourself that bothers you?


                        *                *                *

Q        That's it.  Okay.  Now, you had some blood sugar problems?

A        Yes, ma'am.  I have hypoglycemia.

Q        Low blood sugar.

                        *                *                *

A        Actually, they've gone from hypoglycemia to pre-diabetes.

                        *                *                *

Q        Do you have any symptoms as a result of that?

A        Yeah.  I get real lightheaded, sick to my stomach, real shaky, real tired.

                        *                *                *

A       I always carry a headache.

                    *               *               *

Q       You mean never, ever without one?

A       Never, ever without one.

                    *               *               *

Q       How often do you have the migraines?

A       Not as often as most people have migraine headaches.  But on the average, I probably get two a week.

Q       And how long do they last?

A       All day.  Sometimes a couple days.

                    *               *               *

A        I avoid the light after the headache.

Q       Okay.  All right.  Now, stomach problems. Do you have any stomach pain, abdominal pain?

A       From my medication.

Q       Which medications?

A       The arthritis medication.

                    *               *               *

Q       - - during the day.  If I ask you to focus on the time period, on an average, between 9:00 and 5:00, and if you put it all together, approximately how much of the day do you think that you are resting, as opposed to doing some sort of activity?

A       Probably about two- and-a half, three hours.  That would be total.

Q      Do you have any difficulty with mental functions, such as - - well, remembering, concentrating, following directions?

A      My memory is bad.

Q      Anything in particular that you are thinking of that has to do with your memory?

A      I think it's when I took the blow to the head from the assault.

Q      What do you have difficulty remembering?  What sorts of things?

A      Sometimes anything.  I used to be able to remember phone numbers.  I used to have almost a photographic memory.  And I'm lucky if I can remember an important doctor's appointment.

*                *                *

Q      All right.  Do you have any difficulty sustaining attention or remembering or following the plot?

A      Yes.

Q      Could you tell me a little bit about that?

A      I just - - I get confused and can't remember exactly which events happened as far as the order that they would happen in.

*                *                *

A      I used to camp and sew and get involved with kids.

Q      When is the last time you went camping?

A      Two years ago, two-and-a half years ago.

Q      Anything in particular that makes that difficult?

A      All of it.

Q	How about sewing?

A	I used - -

Q	When was the last - -

A	Oh, God.  It's probably been five years since I've sewed.

Q	And what is the reason for it?

A	My hands.

Q	Now, you said get involved with kids?

A	Um-hum.

Q	What kind of involvement?

A	My house used to be the house where all the kids would gather and we'd go to the park or take off and go to the river.

Q	When is the last time you did anything like that?

A	It's been at least two years.

*	*	*

Q	- - and the alcohol?  Okay.  And did you say you have three panic attacks - - is it a day or a week?  I didn't catch that.

A	A week.

Q	Okay.  And they're primarily precipitated when you're in - - around 10 to 12 people?

A	A group of people.

*	*	*

Q	Do you think - - have you been actually diagnosed with diabetes or is it - - or they

just evaluate - - your doctors evaluate your blood sugar?

A        I've - - I have been diagnosed with the hypoglycemia.

## 2.  Vocational Expert

Testimony was taken at the hearing from Vocational Expert, who testified as follows (Tr. 404-410):

A        Yes, Your Honor.  At the convenience store, it was indicated that she was a sales assistant, did daily reports, salesclerk and was a cashier.  As she performed it, it was a semi-skilled job and it was performed at the light level, Your Honor.

Q        Please assume a younger individual with a GED, vocational certificate in business, precluded from performing all, but sedentary work with a sit/stand option. No repetitive bending and no hazards, such as dangerous and moving machinery, unprotected heights.  A controlled environment that is free of excessive dust, fumes, pollutants.  Work that is no climbing - - has no climbing and that's unskilled and low stress, defined as one and two-step processes, routine and repetitive tasks, primarily working with things, rather than people, entry-level.  With those limitations, can you describe any work this hypothetical individual can perform?

                    *               *               *

A        Your Honor, considering the hypothetical you've given to me for comment, the person with a - - who is similar in profile to the Claimant, someone who would be restricted to the sedentary level, and considering the other factors in your hypothetical, it would be my testimony that jobs would exist in the national economy and also the State of West Virginia economy.  The first being that of a surveillance system operator at the sedentary level for which there are at least 755,000 jobs in the national economy and at least 4200 in the state economy.  Secondly, would be

that of a timekeeper clerk at the sedentary level for which there are at least 100,000 jobs in the national economy and at least 900 in the state economy. Those listings are consistent with the Dictionary of Occupational Titles.

Q        There is an RFC of a psychologist who examined the Claimant at Ms. Van Nostrand's request at Exhibit 18F. In that RFC, the doctor - - the psychologist wrote that Ms. Kandel, among other things, would have marked inability to exercise judgment or make simple, work-related decisions. Marked is defined in Exhibit 18F, page 22 as one-third to two-thirds of the workday she would be limited. If she can't make simple, work-related decisions one-third to two-thirds of the workday, are those jobs impacted?

A        Yes. If that would be the case, Your Honor, that would remove all the jobs I listed, as well as any other jobs that might exist in the national or state economy.

Q        Similarly, if stress intolerance was so severe that she could not stay on task one-third to two-thirds of the day, are those jobs impacted?

A        Yes. My response would be the same as in hypothetical number two, Your Honor.

Q        There is an RFC of a treating physician, Dr. Secali, stating - - in Exhibit 19F, page five, in which he indicates the Claimant could sit, stand, and walk a total of less than two hours. Is that inconsistent with the jobs you named in hypothetical one?

A        The last part of what you read, Your Honor? I'm sorry.

Q        Of two hours of sitting, standing, and walking in an eight-hour day. Is that inconsistent with - -

A        Yeah. My response would be the same as two - - hypotheticals two and three.

ALJ        Okay.

ATTY           Excuse me, Your Honor.

ALJ             Sure.

ATTY           I believe the form says each at one time.

ALJ             Oh, thank you, so much.

ATTY           I beg your pardon.

ALJ             Okay.  Thank you for telling me that.  This is a - - he doesn't really give an eight-hour - - okay.  He says - - okay.  I'll withdraw that question.  Hypothetical four will be withdrawn.  If the Claimant had to lie down every one hour in the a.m. of a workday, Mr. Panza, one hour in the p.m., are those jobs affected?

VE              Yes, Your Honor.  That would remove all the jobs nationally and also in the state.

ALJ             If the Claimant were to be absent from work more than three times a month, as Dr. Secali indicated in Exhibit 19F-6, is that a tolerable limit of absenteeism?

VE              No.   That would once again be a very negative factor in the individual's ability to retain employment or to obtain employment.

                                *                *                *

ATTY           - - testimony, yeah.  All right.  Well, then I'll skip to hands.  Well, he just indicates that sometimes she would have significant limitations in reaching, handling, and fingering.  If her hands are swollen, she may have a problem.  I'm thinking that that would probably be occasionally.  We'll say probably, say, one-third of the time she would have significant limitations in reaching, handling, or fingering and that would be repetitively or prolonged.  Would any of the jobs identified require any prolonged or repetitive fingering,

feeling, or reaching?  Reaching, handling, or fingering, I guess is - -

                    *              *                *

       ALJ          So her question, Mr. Panza, is that if the Claimant has this difficulty with

reaching, handling one-third of the day - - is it reaching, handling, and what, Ms. Van Nostrand?

       ATTY        Reaching, handline, or fingering up to one-third of the time.

       ALJ          Do the jobs you named in - -

       VE           That should - -

       ALJ          - - hypothetical one - -

       VE           - - not affect that.

       ATTY        Shouldn't affect.  All right.  One last - - I don't think we asked about stress.

But this person would have a moderate to marked inability to tolerate ordinary work stress.  In a

situation where a person has an intolerance to just the stress of getting up, going to work,

sustaining a regular routine, performing job duties on a regular basis without decompensating

with stress symptoms, be they panic attacks, increased pain, muscle spasms, just inability to

attend to the task, would that rule out the jobs that you've identified?

       VE           Yes, from a cumulative standpoint.

       ATTY        It would.  Now, I'd like the DOT numbers, please, of the jobs you've

identified and - - or exemplary DOT numbers.

       VE           Yes.  The surveillance system operator, 379.367-010.  And for the

timekeeper, 215.362-018.

    E.      <u>Lifestyle Evidence</u>

    The following evidence concerning the Claimant's lifestyle was obtained at the hearing

and through medical records. The information is included in the report to demonstrate how the Claimant's alleged impairments affect her daily life.

- Smokes one pack daily (Tr. 374).

- Has a driver's license (tr. 372).

- Can sit comfortably, 15-20 minutes (Tr. 386).

- Can walk a block or a block and a half at one time (Tr. 387).

- Can climb one or two steps. (Tr. 387).

- Goes to the Post Office–"roughly twice a week." (Tr. 387).

- Can carry a couple of pounds on a regular basis. (Tr. 388).

- Sometimes naps for 30-45 minutes. (Tr. 388).

- Does a little cooking. (Tr. 390).

- Can "piddle" around the house for 15-20 minutes at a time. (Tr. 390).

- Reads novels once in a while. (Tr. 403).

### III. The Motions for Summary Judgment

A.   <u>Contentions of the Parties</u>

Claimant contends that the ALJ's decision is not supported by substantial evidence. Specifically, Claimant asserts that the ALJ erred: (1) in failing identify the pertinent Listing and in summarily concluding that Claimant's "'impairments, considered singly or in combination, are not of a level of severity to meet or equal any of the impairments detailed in Appendix 1'"; (2) in disregarding the RFC of Dr. Saikali, a rheumatology specialist, and in failing to recognize the significance of the treatment by Dr. Topping; (3) in failing to apply SSR 99-2p; (4) in relying upon an incomplete and inadequate hypothetical question posed to the VE; and, (5) in disregarding the

mandates of SSR 96-7p when determining the issue of Claimant's credibility of subjective symptoms.

Commissioner maintains that the ALJ's decision was supported by substantial evidence. Specifically, Commissioner contends that the ALJ (1) properly identified the pertinent Listing and concluded that Claimant's impairments do not meet or equal any of the impairments detailed in Appendix 1; (2) properly disregarding the RFC of Dr. Saikali because his report was speculative in nature, inconsistent with the over record and based on Claimant's subjective complaints; (3) did not err in not applying SSR 99-2p and properly analyzed Claimant's fibromyalgia under the five-step sequential evaluation; (4) posed a proper hypothetical question to the VE; and, (5) properly determined that Claimant's subjective symptoms were not fully credible in light of the total evidence.

B.      The Standards.

1.      Summary Judgment. Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  All inferences must be viewed in the light most favorable to the party opposing the motion.  Matsushita Elec.  Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." Anderson v.  Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

2.      Judicial Review.  Only a final determination of the Commissioner may receive judicial review.  See, 42 U.S.C. §405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir. 1986).

3.      Social Security - Medically Determinable Impairment - Burden. Claimant bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy.  42 U.S.C. § 423(d)(1), (d)(2)(A); Heckler v. Campbell, 461 U.S. 458, 460 (1983).

4.      Social Security - Medically Determinable Impairment.  The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques.  42 U.S.C. § 423(d)(1), (3); Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5.      Disability Prior to Expiration of Insured Status- Burden.  In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status.  Highland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(i), 423(c); Stephens v. Shalala, 46 F.3d 37, 39 (8th Cir.1995)).

6.      Social Security - Standard of Review.  It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the court's judgment for that of the Secretary.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.      Social Security - Scope of Review - Weight Given to Relevant Evidence.  The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry." Milburn Colliery Co. v. Hicks, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all

of the relevant evidence.  Gordon v. Schweiker, 725 F.2d 231, 235-36 (4th Cir. 1984).

8.    Social Security - Substantial Evidence - Defined.  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9.    Social Security - Sequential Analysis.  To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform her past work; and 5) whether the claimant is capable of performing any work in the national economy.  Once claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment.  If the claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job.  Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).

10.    Evidence - Weight.  The ALJ is required to indicate the weight given to all relevant evidence.  Gordon v. Schweiker, 725 F.2d 231 (4th Cir. 1984).  However, the ALJ is not required to discuss every piece of evidence.  Green v. Shalala, 51 F.3d 96, 101 (7th Cir. 1995).

11.    Social Security - Treating Physician - Opinion that Claimant is Disabled.  An opinion that a claimant is disabled is not a medical opinion within the definition of 20 C.F.R. §§ 404.1527, 416.927.  A statement by a medical source that Claimant is disabled or unable to work does not mean that the Commissioner will determine that Claimant is disabled.  20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1).  The Commissioner is responsible for making the determination whether a claimant

meets the statutory definition of disability.  Id.  No special significance will be given to the source of an opinion on issues reserved to the Commissioner.  20 C.F.R. §§ 404.1527(e)(3), 416.927(e)(3).

12.  Social Security - Treating Physician - Controlling Weight - The opinion of a treating physician will be given controlling weight if the opinion is 1) well-supported by medically acceptable clinical and laboratory diagnostic techniques and 2) not inconsistent with other substantial evidence in the case record.  20 C.F.R. § 416.927(d)(2).  See also  Evans v. Heckler, 734 F.2d 1012 (4th Cir. 1984); Heckler v. Campbell, 461 U.S. 458, 461 (1983); Throckmorton v.  U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir.  1990).

13.  Social Security - Treating Physician - Speculative Opinion.  An ALJ is not bound to accept the opinion of a treating physician which is speculative and inconclusive.  Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

14.  Social Security - Treating Physician - Not Entitled to Controlling Weight.  When not entitled to controlling weight, the medical opinion of a treating physician is still entitled to deference and must be weighed according to the following five factors: 1) length of the treatment relationship and frequency of examinations, 2) nature and extent of the treatment relationship, 3) supportability, 4) consistency, and 5) specialization.  20 C.F.R. §§ 404.1527(d), 416927(d).  When benefits are denied, the ALJ must give good reasons in the notice of decision for the weight given to a treating source's medical opinion(s).  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

15.  Social Security - Claimant's Credibility - Pain Analysis.  The determination of whether a person is disabled by pain or other symptoms is a two step process.  First, the ALJ must expressly consider whether the claimant has demonstrated by objective medical evidence an impairment capable of causing the degree and type of pain alleged.  Second, once this threshold

determination has been made, the ALJ must consider the credibility of her subjective allegations of pain in light of the entire record.  Craig v. Chater, 76 F.3d 585 (4th Cir. 1996).

16.    Social Security - Vocational Expert - Hypothetical.  In order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record and it must be in response to proper hypothetical questions which fairly set out all of the claimant's impairments.  Walker v. Bowen, 889 F.2d 47, 50-51 (4th Cir. 1989).  The ALJ is afforded "great latitude in posing hypothetical questions," Koonce v. Apfel, No. 98-1144, 1999 WL 7864, at *5 (4th Cir. Jan.11, 1999)[7], and need only pose those that are based on substantial evidence and accurately reflect the plaintiff's limitations.  Copeland v. Bowen, 861 F.2d 536, 540-41 (9th Cir. 1988).

17.    Social Security - Vocational Expert - Hypothetical - Claimant's Counsel.  Based on the evaluation of the evidence, an ALJ is free to accept or reject restrictions included in hypothetical questions suggested by a claimant's counsel, even though these considerations are more restrictive than those suggested by the ALJ.  France v. Apfel, 87 F. Supp. 2d 484, 490 (D. Md. 2000) (citing Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir.1986)).

C.    Discussion

1.    The ALJ Failed to Adequately Explain Why Claimant did not Meet or Equal the Requirements of a Listed Impairment.

Claimant argues that the ALJ erred because he did not sufficiently explain why Claimant did not meet or equal requirements of a listed impairment.   The Commissioner argues that the

---

[7] This Court recognizes that the United States Court of Appeals for the Fourth Circuit disfavors citation to unpublished opinions.  I recognize the reasons for that position and acknowledge it.  Unfortunately, there is not a better indicator of what its decision might be in this regard.

ALJ has sufficiently articulated his assessment of the record.

This Court's review of a denial of SSI benefits is limited to whether substantial evidence supports the Commissioner's decision and whether the correct legal standard was applied.  Pass v. Chater, 65 F.3d 1200, 1202 (4th Cir. 1995).  Substantial evidence is more than a mere scintilla, but may be less than a preponderance, and means such evidence as a reasonable mind might find adequate to support a conclusion.  Smith v. Chater, 99 F.3d 635, 637-38 (4th Cir. 1995).  In reviewing an administrative record for substantial evidence, it is inappropriate to reweigh the evidence, resolve conflicts, decide questions of credibility, or supplant the Commissioner's judgment.  Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).  The ALJ must accompany his decision with sufficient explanation to allow a reviewing court to determine whether the Commissioner's decision is supported by substantial evidence.  Cook v. Heckler, 783 F.2d 1168, 1172 (4th Cir. 1986); Hammond v. Heckler, 765 F.2d 424, 426 (4th Cir. 1985).

In his decision, the ALJ stated the following:

> At the step three of the evaluation process it is found that the claimant's impairments, considered singly or in combination, are not of a level of severity to meet or equal any of the impairments detailed in Appendix 1 to Subpart P of Regulations No.4.  As detailed by Dr. Saikali (Exhibit 19F) the claimant's osteoarthritis of the hips does not satisfy the requirements of Section 1.02 of Appendix 1.  The claimant's fibromyalgia is not attended by clinical findings that satisfy the requirements of any of the impairments detailed in Section 1.– of Appendix 1, dealing with the musculoskeletal system.  The claimant's asthma and chronic obstructive pulmonary disease are not attended by clinical findings that satisfy the requirements of any of the impairments detained in Section 3.00 of Appendix 1, dealing with the respiratory system.  (Tr. 21).

In this case, the ALJ's decision does not specify what evidence  he relied on in reaching his conclusion.  Consequently, the Undersigned is unable to determine whether this finding is supported by substantial evidence or is in accordance with the law.  Under these circumstances, remand is appropriate, so that the ALJ may explain his findings.  The Undersigned, therefore,

recommends that this matter be REMANDED to the Commissioner and that the ALJ be instructed, on remand, to fully consider and state his reasons for determining whether or not Claimant satisfies the pertinent listings of Appendix 1.

2. The ALJ Erred in Disregarding the RFC of Dr. Saikali and in Failing to Recognize the Significance of the Treatment by Dr. Topping.[8]

Claimant asserts that the ALJ improperly evaluated the opinion of Dr. Saikali, Claimant's treating physician. Commissioner counters that the ALJ gave proper weight to Claimant's treating physician.

It is the duty of the ALJ, not the courts, to make findings of fact and resolve conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The scope of review is limited to determining whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the Commissioner. Id. The opinion of a treating physician will be given controlling weight if the opinion is 1) well-supported by medically acceptable clinical and laboratory diagnostic techniques and 2) not inconsistent with other substantial evidence in the case record. 20 C.F.R. §416.927(d)(2). See also, Evans v. Heckler, 734 F.2d 1012 (4th Cir. 1984); Heckler v. Campbell, 461 U.S. 458, 461 (1983); Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990).

In this case, the ALJ specifically considered Dr. Saikali's RFC, dated July 3, 2003, and found that Dr. Saikali's RFC "cannot be accorded controlling weight ... as this assessment is

---

[8] The Undersigned notes that Claimant, in her assignment of errors, alleges that the ALJ failed to "recognize the significance of the treatment by Dr. Topping"; however, she failed to mention Dr. Topping in the body of her motion. Therefore, the Undersigned need not address this issue.

speculative in nature, inconsistent with the overall record and based primarily on the claimant subjective complaints." (Tr. 27). For example, the AlJ noted that in his response to one question, Dr. Saikali opined that " the claimant is disabled from engaging in all full time work activity." (Tr. 27). However, Dr. Saikali also reported, with regard to the issue of whether Claimant meets the Listings, that "the claimant's x-rays does not correlate with her symptoms all the time." (Tr. 27, 344). The ALJ noted that, according to Dr. Saikali's "educated guess based on other patient's experience," Claimant can sit or stand/walk for less than two hours. (Tr. 27, 339). Dr. Saikali reported that Claimant may "sometimes" have "significant limitations" with reaching, handling or fingering, if her hands were swollen. (Tr. 28, 265, 340). However, he also reported a lack of active synovitis on examination. (Tr. 28, 265, 305). Finally, the ALJ found that "the clinical findings, including those reported by Dr. Saikali, fail to support his opinion that the claimant would be absent from work more than three times a month due to her impairments or treatment." (Tr. 28, 340). The ALJ noted that "the claimant has failed to establish any ongoing physical therapy or other treatment for her conditions despite Dr. Saikali's initial recommendation of aggressive exercises for treatment of the fibromyaligia." (Tr. 28).

Dr. Kaili's opinion is not consistent with the opinions of the other physicians. For example, Dr. Sabio opined that Claimant had an essentially negative SLR, was able to walk with a normal gait, did not require ambulatory aids, was stable at station, had a normal neurological examination, did not have muscle atrophy or weakness, was able to squat fully, could walk on her heels, on her toes, and heel-to-toe and tandem, and her fine manipulation movements were normal (Tr. 155-159). Additionally, Dr. Topping recommended a "sedentary type position" and Dr. Osborne also opined that Claimant could perform sedentary work. (Tr. 139, 154).

In this case, the ALJ has sufficiently articulated his assessment of the evidence. Therefore, because Dr. Kaili's July 3, 2003 opinion is inconsistent with other substantial evidence in the record, the ALJ did not err when he did not give controlling weight to the opinion of Dr. Sakaili.

### 3. The ALJ Erred in Failing to Apply SSR 99-2p.

Claimant further contends that, since she was diagnosed with fibromyalgia, the ALJ erred in failing to apply SSR 99-2p. The Commissioner argues that the ALJ did recognize fibromyalgia as an impairment, but determined it was not disabling.

A disability is defined under the Social Security Act as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment (or combination of impairments) which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. See 42 U.S.C. 423(d)(1)(A). In Social Security Ruling (SSR) 99-2p, the Commissioner stated that, when accompanied by appropriate medical signs or laboratory findings, CFS can be a medically determinable impairment. See Social Security Ruling 99-2p, 64 Fed.Reg. 23380-03, at 23381 (Apr. 30, 1999). The ruling instructs that, before rejecting a claim based on CFS, the ALJ must first consider the medical evidence and evaluate the condition as any other unlisted impairment. Id. Therefore, the CFS claim is analyzed under the same five step framework applied to every social security disability claim. See 20 C.F.R. 416. 920. Moreover, the Social Security Administration ("SSA") defers to the American College of Rheumatologists' ("ACR") diagnostic criteria for fibromyalgia, which requires a history of bodily pain and tenderness in at least eleven of eighteen designated tender points. See Social Security Ruling 99-2p, 64 Fed.Reg. 23380-03, at

23382 n. 3 (Apr. 30, 1999).  The SSA considers fibromyalgia in conjunction with chronic fatigue

syndrome ("CFS"), as some of the symptoms overlap.[9]  Id.  However, the two conditions are not

the same; therefore, SSR 99-2p is not binding as to the evaluation of fibromyalgia.  The

Undersigned further notes that the Commission does not  challenge the fibromyalgia diagnosis

and/or whether fibromyalgia is a medically determinable impairment.  Additionally, although the

ALJ did not refer to SSR 99-2p, he specifically found at step two of the five-step sequential

analysis that Claimant's fibromyalgia was a "severe" impairment.  (Tr. 30).  Therefore, the

Undersigned finds that the ALJ properly took such issues into consideration in evaluating the

evidence without referring to SSR 99-2p.

4.  <u>The ALJ Relied Upon an Incomplete and Inadequate Hypothetical Question Posed to the
Vocational Expert.</u>

Claimant further contends that the ALJ relied upon an incomplete and inadequate

hypothetical to the VE.  The Commissioner counters that the ALJ accurately set forth Claimant's

limitations in the hypothetical.

The question is whether the hypothetical question properly set forth all the relevant

evidence of record concerning Claimant's impairments.  The Fourth Circuit Court of Appeal has

held, albeit in unpublished opinion, that while questions posed to the vocational expert must fairly

set out all of the claimant's impairments, the question need only reflect those impairments

supported by the record.   <u>Russell v. Barnhart</u>, No. 02-1201, 2003 U.S. App. LEXIS 2178 (4th

Cir. Feb. 7, 2003).  The court further stated that the hypothetical question may omit non-severe

---

[9]  "Individuals with impairments that fulfill the American College of Rheumatology
criteria for [fibromyalgia syndrome] (which includes a minimum number of tender points) may
also fulfill the criteria for CFS."  <u>Id</u>. at 23382 n. 3.

impairments, but must included those that the ALJ finds to be severe.  Id.

The ALJ's hypothetical to the vocational expert incorporated Claimant's limitations that are supported by the record.  The ALJ specifically noted that he did not accept the VE's testimony that a person who had to lie down for one hour in the morning and afternoon, would be absent three days a month or had severe stress intolerance could not perform any jobs on a sustained basis because "the hypothetical factors upon which [it is] based [is] considered to be a material exaggeration of the substantial evidence of record."  (Tr. 29).  Therefore, the ALJ posed a proper hypothetical to the VE.

5. The ALJ Disregarded the Mandates of SSR 96-7p When Determining the Issue of Subjective Symptoms.

Claimant further contends that the ALJ did not properly take into account the Claimant's claim  of disability due to pain.  The Commissioner counters that the ALJ properly considered Claimant's subjective complaints in accordance with the Social Security Regulations at 20 C.F.R. § 404.1529.  Following the Craig v. Chater, 76 F.3d 585, 592-93 (4th Cir. 1996) analysis, Commissioner asserts that the ALJ correctly made a threshold determination that the Claimant had discernable medical conditions that could cause the alleged symptoms, but the ALJ also correctly found that the Claimant's symptoms were not so severe as to prevent her from performing a range of sedentary work.

Unfortunately for the Claimant, her argument is without merit.  The determination of whether a person is disabled by pain is a two step process.  First, the ALJ must consider whether there is objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the pain or other symptoms alleged.  Craig, 76 F.3d at 594.  Second, once this threshold determination has been made, the ALJ must consider the credibility

of Claimant's subjective allegations of pain in light of the entire record.  Id. at 595.

In this case, the ALJ correctly applied the two step pain analysis.  The ALJ conducted a comprehensive review of the medical evidence record. (Tr. 24-27).  The ALJ found that the medical record shows "a basis for a degree of pain and functional limitations related to the claimant's impairments..." and "...a basis for a degree of pain related to the claimant's osteoarthritis in her hips and fibromyalgia."  (Tr. 24, 27).  This satisfies the first prong of the Craig test.  In light of the medical record, the ALJ stated that "the claimant's testimony regarding the nature and severity of her limitations is not fully credible."  (Tr. 24).  The ALJ concluded that the Claimant retains the ability to perform a range of sedentary work (Tr. 27).  This satisfies the second prong of the Craig test.

Therefore, Claimant's argument that the ALJ erred by disregarding the pain standard is without merit.  The ALJ followed the law in his application of the established pain standard.

## IV.  Recommendation

For the foregoing reasons, I recommend that:

1.      Claimant's Motion for Summary Judgment be DENIED, and this matter be REMANDED to the Commissioner of Social Security to consider explicitly and state the  reasons for determining whether Claimant satisfies the pertinent listings of Appendix 1.

2.      Commissioner's Motion for Summary Judgment be DENIED for the same reasons set forth above.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to

which objection is made, and the basis for such objection.   A copy of such objections should be submitted to the District Court Judge of Record.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

The Clerk of the Court is directed to provide a copy of this Report and Recommendation to parties who appear *pro se* and all counsel of record, as applicable, as provided in the Administrative Procedures for Electronic case Filing in the Unites States District Court for the Norther District of West Virginia.

DATED: January 6, 2006

/s/ James E. Seibert
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE